[No. B223996. Second Dist., Div. Four. Feb. 15, 2011.]

NO DOUBT, Plaintiff and Respondent, v.
ACTIVISION PUBLISHING, INC., Defendant and Appellant.

COUNSEL

Quinn Emanuel Urquhart & Sullivan, Susan R. Estrich, Stan Karas and Michael T. Zeller for Defendant and Appellant.

Proskauer Rose, Gil N. Peles and Bert H. Deixler for Plaintiff and Respondent.

OPINION

WILLHITE, J.—

## INTRODUCTION

The rock band No Doubt brought suit against the video game publisher Activision Publishing, Inc. (Activision), based on Activision's release of the Band Hero video game featuring computer-generated images of the members of No Doubt. No Doubt licensed the likenesses of its members for use in Band Hero, but contends that Activision used them in objectionable ways outside the scope of the parties' licensing agreement. Activision filed a special motion to strike under Code of Civil Procedure section 425.16, contending that No Doubt cannot demonstrate a probability of prevailing on its claims for violation of the right of publicity (Civ. Code, § 3344 and common law) and unfair competition (Bus. & Prof. Code, § 17200) because its use of the No Doubt likenesses is protected by the First Amendment. Activision appeals from the trial court's denial of its motion. Applying the transformative use test first adopted in *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387 [106 Cal.Rptr.2d 126, 21 P.3d 797], we conclude that the creative elements of the Band Hero video game do not transform the images of No Doubt's band members into anything more than literal, fungible reproductions of their likenesses. Therefore, we reject Activision's contention that No Doubt's right of publicity claim is barred by the First Amendment. In addition, we disagree with Activision's contention that No Doubt must demonstrate that Activision used the likenesses of the band members in an "explicitly misleading" way in order to prevail on its unfair competition claim. Accordingly, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Band Hero Dispute*

Defendant Activision is a leading international video game distributor and the creator and owner of the interactive Band Hero video game. Band Hero is

a version of Activision's Guitar Hero franchise that has sold over 40 million units.[1] The game allows players to simulate performing in a rock band in time with popular songs. By choosing from a number of playable characters, known as "avatars," players can "be" a guitarist, a singer, or a drummer. Some of the available avatars are fictional characters created and designed by Activision while others are digital representations of real-life rock stars. Players can also design their own unique fictional avatars. Represented by the avatars of their choosing, players "perform" in various settings, such as venues in Paris and Madrid, a rock show at a shopping mall, and even outer space.

In addition to allowing players to perform over 60 popular songs, Band Hero permits players to create their own music and then play their compositions using an avatar. As with all the Guitar Hero video games, as players advance in the Band Hero game, they can "unlock" characters and use them to play songs of the players' choosing, including songs the players have composed as well as songs made famous by other artists.

Plaintiff No Doubt is an internationally recognized rock band featuring Gwen Stefani as its lead singer. No Doubt entered into a professional services and character licensing agreement (Agreement) with Activision permitting Activision to include No Doubt as one of the rock bands featured in Band Hero.

The pertinent language of the Agreement is as follows: "This Agreement sets out the terms upon which Artist [(No Doubt)] has agreed to grant to Activision certain rights to utilize Artist's name(s), likeness(es), logo(s), and associated trademark(s) and other related intellectual property rights (the 'Licensed Property') and to provide Activision certain production and marketing services in connection with Activision's 'Band Hero' video game (the 'Game')." The Agreement specifically provides that "Artists grant to Activision the non-exclusive, worldwide right and license to use the Licensed Property (including Artist's likeness as provided by or approved by Artist) solely in the one (1) Game for all gaming platforms and formats, on the packaging for the Game, and in advertising, marketing, promotional and PR materials for the Game." In a section entitled "Approval Rights," the Agreement states that "Artist's likeness as implemented in the Game (the 'Character Likeness'), any use of Artist's name and/or likeness other than in a 'billing block' fashion on the back of the packaging for the Game, and the b-roll and photography or other representation of the Services or of Artist, shall be subject to Artist's prior written approval. [¶] Activision shall submit each of the above (i.e., the Character Likeness, name uses, and b-roll and photography or other representation) to Artist for review and Artist shall have

---

[1] The parties submitted DVD's depicting the game, which we have reviewed.

ten (10) business days to either approve or disapprove. . . . [¶] Activision shall not be required to submit for approval uses of previously approved assets, provided such uses fall within the rights granted herein (e.g., using a previously approved Character Likeness depiction in multiple advertising materials)."

As part of the Agreement, Activision agreed to license no more than three No Doubt songs for use in Band Hero, subject to No Doubt's approval over the song choice. (Ultimately, the game included two No Doubt songs.) No Doubt agreed to participate in one day of game production services "for the purposes of photographing and scanning Artist's likeness, and capturing Artist's motion-capture data."

Pursuant to the Agreement, the members of No Doubt participated in a full-day motion capture photography session at Activision's studios so that the band members' Band Hero avatars would accurately reflect their appearances, movements, and sounds. No Doubt then closely reviewed the motion capture photography and the details related to the appearance and features of their avatars to ensure the representations would meet their approval. The end results are avatars that closely match the appearance of each of the No Doubt band members.

Approximately two weeks prior to the release of Band Hero, No Doubt became aware of the "unlocking" feature of the game that would permit players to use No Doubt's avatars to perform any of the songs included in the game, including songs that No Doubt maintains it never would have performed. Two of No Doubt's members could be unlocked at the seventh level of the game, and the remaining members could be unlocked at level nine. The band also learned that female lead singer Gwen Stefani's avatar could be made to sing in a male voice, and the male band members' avatars could be manipulated to sing songs in female voices. The individual band member avatars could be made to perform solo, without their band members, as well as with members of other groups. No Doubt contends that in the numerous communications with No Doubt, Activision never communicated its intention to permit such manipulations of the No Doubt avatars. Rather, No Doubt insists, Activision represented that No Doubt's likenesses within Band Hero would be used only in conjunction with the selected No Doubt songs.

When No Doubt complained about the additional exploitation of their likenesses, Activision admitted that it had hired actors to impersonate No Doubt in order to create the representations of the band members' performances of the additional musical works other than the No Doubt songs licensed for the game. No Doubt demanded that Activision remove the "unlocking" feature for No Doubt's avatars, but Activision refused. Activision

contends that No Doubt's request came only after the programming had been finalized and the manufacturers had approved the game for manufacture.

*Procedural History*

No Doubt filed a complaint against Activision in superior court, seeking injunctive relief and damages for Activision's allegedly unauthorized exploitation of No Doubt's name, performances and likenesses. No Doubt alleged six causes of action: (1) fraudulent inducement; (2) violation of statutory and common law right of publicity; (3) breach of contract; (4) unfair business practices in violation of Business and Professions Code section 17200; (5) injunctive relief; and (6) rescission.[2]

Activision filed a special motion to strike pursuant to Code of Civil Procedure section 425.16 (section 425.16) specifically with respect to No Doubt's claims for violation of the right of publicity and unfair competition. The superior court denied the anti-SLAPP (strategic lawsuit against public participation) motion, holding that Activision failed to meet the required threshold showing that the challenged causes of action arose from protected activity in furtherance of free speech rights, and that Activision's literal reproductions of the images of the No Doubt members did not constitute a "transformative" use sufficient to bring them within the protection of the First Amendment. The court found that even if Activision had satisfied its initial burden, No Doubt had demonstrated a probability of prevailing on its claims because it convincingly argued that Activision had contracted away any First Amendment right to exploit the images of the No Doubt members except as provided by the agreement between the parties. As such, the court held, Activision had "waived the anti-SLAPP protections."

This timely appeal followed.

## DISCUSSION

### I. *Anti-SLAPP Motion Procedure*

Section 425.16 provides, in pertinent part, that "[a] cause of action against a person arising from any act of that person in furtherance of the

---

[2] Activision initially removed the case to federal court, contending that No Doubt's claims were preempted by the federal Digital Millenium Copyright Act (Pub.L. No. 105-304 (Oct. 28, 1998) 112 Stat. 2860). Activision then answered the complaint and filed cross-claims for breach of contract and unjust enrichment based on No Doubt's alleged failure to provide marketing and promotional services as the band had contracted to do. The federal district court remanded the case to state court, finding that No Doubt's claims as alleged were not preempted by the copyright act. (*No Doubt v. Activision Publishing, Inc.* (C.D.Cal. 2010) 702 F.Supp.2d 1139.)

person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the statute is "to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056 [39 Cal.Rptr.3d 516, 128 P.3d 713]; see § 425.16, subd. (a).) The provisions of section 425.16 must be "construed broadly" to effectuate the statute's purpose. (§ 425.16, subd. (a).)

(2) A special motion to strike under section 425.16 entails a two-step process. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*).) First, the defendant must make a threshold showing that the challenged cause of action arises from protected activity. (*Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1056.) If the defendant makes this showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits of the claim. (*Ibid.*) The plaintiff must state and substantiate a legally sufficient claim: " '[p]ut another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' " (*Ibid.*) For purposes of this inquiry, "the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation] . . . ." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733]; see § 425.16 subd. (b)(2).) However, " 'the court does not weigh the evidence or make credibility determinations. [Citations.]' " (*Ross v. Kish* (2006) 145 Cal.App.4th 188, 197 [51 Cal.Rptr.3d 484].) In addition to considering the substantive merits of the plaintiff's claims, the trial court must also consider all available defenses to the claims, including constitutional defenses. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398 [13 Cal.Rptr.3d 353].)

"Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier, supra*, 29 Cal.4th at p. 89.) We review de novo whether the trial court should have granted Activision's special motion to strike, conducting an independent review of the entire record. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

## II. *No Doubt's Claims Arose from Protected Activity*

■ A defendant satisfies its initial burden under section 425.16 by demonstrating that the act underlying the challenged claims fits one of the

categories described in section 425.16, subdivision (e). (*Navellier, supra,* 29 Cal.4th at p. 88.) One of these categories is "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

■ Video games generally are considered "expressive works" subject to First Amendment protections. (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 58 [50 Cal.Rptr.3d 607] (*Kirby*); see *Video Software Dealers Assn. v. Schwarzenegger* (9th Cir. 2009) 556 F.3d 950, 958, cert. granted *sub nom. Schwarzenegger v. Entertainment Merchants Assn.* (2010) ___ U.S. ___ [176 L.Ed.2d 784, 130 S.Ct. 2398]; *Romantics v. Activision Publishing, Inc.* (E.D.Mich. 2008) 574 F.Supp.2d 758, 765–766 [finding that Activision's Guitar Hero video game is "an expressive artistic work that is entitled to First Amendment protection"].) Further, Activision's use of No Doubt's likenesses in Band Hero is a matter of public interest because of the widespread fame No Doubt has achieved; " ' "there is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities . . . ." [Citation.]' [Citation.]" (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 677–678 [105 Cal.Rptr.3d 98] [magazine's publication of "indie rock" bands' names was matter of public interest].) Accordingly, the use of No Doubt's likenesses in the Band Hero video game meets the first requirement of the anti-SLAPP statute.[3]

■ No Doubt contends that Activision cannot satisfy the threshold showing under section 425.16 because a contract issue, not Activision's right to free speech, is at the heart of the parties' dispute. However, in *Navellier,* our Supreme Court responded to a similar argument from the plaintiffs who were suing based on the defendants' alleged breach of an agreement to release claims. The court held that the plaintiffs had set up a "false dichotomy" between actions that target the performance of contractual obligations and those that target the exercise of free speech and petition rights, because "conduct alleged to constitute breach of contract may also come within

---

[3] As Activision observes, in concluding that the challenged claims did not satisfy the first prong, the trial court erred in focusing on whether the First Amendment provided a complete bar to No Doubt's claim. " 'The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. . . .' [Citations.]" (*Navellier, supra,* 29 Cal.4th at pp. 94–95.) " 'Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens.' [Citations.]" (*City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621 [37 Cal.Rptr.3d 632].)

constitutionally protected speech or petitioning." (*Navellier, supra,* 29 Cal.4th at p. 92.) Thus, contrary to No Doubt's contention, cases that center on a contractual dispute are not categorically excluded from the protection of the anti-SLAPP statute.

No Doubt relies on *Duncan v. Cohen* (N.D.Cal., July 22, 2008, No. C 08-2243 BZ) 2008 WL 2891065, but that case is distinguishable. There, the plaintiff brought numerous claims against the defendants based on the defendants' attempt to make a film based on the plaintiff's novel, The River Why. The district court denied the defendants' anti-SLAPP motion, finding that the claims did not arise out of protected activity: "The [defendants] are not claiming their rights to use material from *The River Why* are based on free speech. Rather they contend their rights are based on a contract. . . . This action centers on copyright and contract claims, not protected activity, and the anti-SLAPP statute does not apply." (*Id.* at p. *2.) By contrast, Activision asserts that it has a First Amendment right to exploit the likenesses of No Doubt in Band Hero, separate and apart from its argument that the license from No Doubt permitted Activision's use.

Having concluded that Activision met its burden to show that the challenged claims arose out of protected activity, we discuss below the second prong of section 425.16.

### III. *No Doubt's Probability of Success on the Merits of the Claims*

#### A. *Right of Publicity Claim*

■ No Doubt has alleged a claim for violation of the right of publicity under Civil Code section 3344 (section 3344) as well as under common law. Section 3344 provides in pertinent part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." (§ 3344, subd. (a).) The common law claim for misappropriation of the right of publicity is similar, except there is no requirement that the misappropriation have been done knowingly. (*Kirby, supra,* 144 Cal.App.4th at p. 55.)

■ Generally, "plaintiffs' burden in opposing an anti-SLAPP motion [is] to substantiate *each* element of their cause of action, and not merely to counter defendant's affirmative defenses." (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337 [93 Cal.Rptr.3d 782].) Because one of the elements of both the statutory and common law claim for violation of

the right of publicity is a lack of prior consent on No Doubt's part, No Doubt's claim would fail if Activision were found to hold a valid license to use No Doubt's likenesses in the manner in which they are used in Band Hero. (*Neal v. Electronic Arts, Inc.* (W.D.Mich. 2005) 374 F.Supp.2d 574, 579 [dismissing plaintiff's claims of misappropriation "because the use in question was clearly licensed"].) However, Activision argued below that for purposes of ruling on the anti-SLAPP motion, the trial court did not need to resolve the issue whether the challenged use of the No Doubt avatars was outside the parties' license agreement. Rather than contesting No Doubt's ability to support the "lack of consent" element or any other substantive element of its right of publicity claim, for purposes of its section 425.16 motion Activision asserted below, and contends here, only that the First Amendment provides a complete defense to the claim. Thus, we limit our analysis to the strength of that First Amendment defense.[4]

### 1. *"Transformative Use" Defense*

Activision contends that its use of No Doubt's likenesses in Band Hero constitutes "protected First Amendment activity involving an artistic work," and thus No Doubt's right of publicity claim is completely barred. As discussed above, "[v]ideo games are expressive works entitled to as much First Amendment protection as the most profound literature." (*Kirby, supra*, 144 Cal.App.4th at p. 58.) However, Activision's First Amendment right of free expression is in tension with the rights of No Doubt to control the commercial exploitation of its members' likenesses.

In *Comedy III Productions, Inc. v. Gary Saderup, Inc., supra*, 25 Cal.4th 387, 391 (*Comedy III*), our Supreme Court directly confronted this tension. The court recognized that the right of publicity has a "potential for frustrating

---

[4] We have previously held that " '[a]lthough section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense. [Citation.]' [Citation.]" (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 477 [39 Cal.Rptr.3d 43]; see also *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 969 [106 Cal.Rptr.3d 290].) Other courts have suggested, however, that the burden remains on the plaintiff to overcome the affirmative defenses by demonstrating that the " ' "defenses are not applicable to the case as a matter of law *or* by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." ' " (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285 [67 Cal.Rptr.3d 190], quoting *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1367 [102 Cal.Rptr.2d 864], disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685].) It makes no difference here which party bears the burden on the affirmative defenses, because, as discussed further below, we conclude that Activision's First Amendment defense fails as a matter of law. (See *Winter v. DC Comics* (2003) 30 Cal.4th 881, 888 [134 Cal.Rptr.2d 634, 69 P.3d 473] (*Winter*) [holding that courts can often resolve as a matter of law whether a claim is barred by the 1st Amend.].)

the fulfillment" of both purposes of the First Amendment: "First, ' "to preserve an uninhibited marketplace of ideas" and to repel efforts to limit the " 'uninhibited, robust and wide-open' debate on public issues." ' [Citation.] Second, to foster a 'fundamental respect for individual development and self-realization. . . .' [Citations.]" (*Comedy III, supra,* 25 Cal.4th at pp. 396–397.) "Because celebrities take on public meaning, the appropriation of their likenesses may have important uses in uninhibited debate on public issues, particularly debates about culture and values. And because celebrities take on personal meanings to many individuals in the society, the creative appropriation of celebrity images can be an important avenue of individual expression. . . . [¶] . . . [T]he very importance of celebrities in society means that the right of publicity has the potential of censoring significant expression by suppressing alternative versions of celebrity images that are iconoclastic, irreverent, or otherwise attempt to redefine the celebrity's meaning." (*Id.* at p. 397.)

 But, the court concluded, not all expression with respect to celebrities is insulated by the First Amendment. "The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility. 'Often considerable money, time and energy are needed to develop one's prominence in a particular field. Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion. [Citations.] For some, the investment may eventually create considerable commercial value in one's identity.' [Citation.]" (*Comedy III, supra,* 25 Cal.4th at p. 399.) "[T]he state's interest in preventing the outright misappropriation of such intellectual property by others is not automatically trumped by the interest in free expression or dissemination of information . . . ." (*Id.* at p. 401.)

 The court in *Comedy III* articulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." (*Comedy III, supra,* 25 Cal.4th at p. 391.) Thus, "[w]hen artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist." (*Id.* at p. 405, fn. omitted.) A celebrity may enforce "the right to monopolize the production of conventional, more or less fungible, images" of that celebrity. (*Ibid.*) On the other hand, a work claimed to violate a celebrity's right of publicity is entitled to First Amendment protection where "added creative elements significantly transform the celebrity depiction . . . ." (25 Cal.4th at p. 405, fn. 10.) "Another way of stating the inquiry is whether the celebrity

likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." (*Id.* at p. 406.) The inquiry boils down to "whether the literal and imitative or the creative elements predominate in the work." (*Id.* at p. 407.)

The court then applied its newly minted "transformative use" test to the facts before it. The plaintiff was the owner of the rights to the comedy act known as The Three Stooges. The defendant was an artist who sold lithographs and T-shirts bearing a likeness of The Three Stooges reproduced from a charcoal drawing the artist had created. (*Comedy III, supra,* 25 Cal.4th at p. 393.) The owner sued for violation of the right of publicity under Civil Code section 3344.1, the companion statute to section 3344 that extends the right of publicity to the heirs and assignees of deceased personalities.[5]

The court rejected the artist's contention that the plaintiff's claim was barred by the First Amendment. The court could "discern no significant transformative or creative contribution" in the artist's literal reproduction of the likenesses of The Three Stooges in its charcoal drawing. (*Comedy III, supra,* 25 Cal.4th at p. 409.) The artist's "undeniable skill is manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame." (*Ibid.*)

The court was careful to note that, in some circumstances, literal reproductions of celebrity portraits may be protected by the First Amendment. The court used the example of silk screens created by artist Andy Warhol using images of celebrities such as Marilyn Monroe, Elizabeth Taylor, and Elvis Presley. "Through distortion and the careful manipulation of context, Warhol was able to convey a message that went beyond the commercial exploitation of celebrity images and became a form of ironic social comment on the dehumanization of celebrity itself." (*Comedy III, supra,* 25 Cal.4th at pp. 408–409.)

The Supreme Court again addressed the balance between the First Amendment and celebrities' rights of publicity in *Winter,* in which the defendant was sued for misappropriation under section 3344 after publishing a series of comic books featuring two villainous half-worm, half-human characters named the "Autumn brothers." (*Winter, supra,* 30 Cal.4th at p. 886.) The characters were quite obviously based on the musician brothers Edgar and Johnny Winter, sharing their same long white hair and albino features. (*Ibid.*)

---

[5] The test developed in *Comedy III* "applies equally" to claims under section 3344. (*Winter, supra,* 30 Cal.4th at p. 888.)

Applying the "transformative use" test set forth in *Comedy III*, the court held that the Winter brothers' claim was barred by the First Amendment as a matter of law. The court found that the comic depictions at issue were "not just conventional depictions of plaintiffs but contain significant expressive content other than plaintiffs' mere likenesses. Although the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally. Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized. To the extent the drawings of the Autumn brothers resemble plaintiffs at all, they are distorted for purposes of lampoon, parody, or caricature. And the Autumn brothers are but cartoon characters—half-human and half-worm—in a larger story, which is itself quite expressive." (*Winter, supra*, 30 Cal.4th at p. 890.) The comic books featured "fanciful, creative characters, not pictures of the Winter brothers," in stark contrast to the *Comedy III* products, where the artist "essentially sold, and devoted fans bought, pictures of The Three Stooges, not transformed expressive works by the artist." (*Id.* at p. 892.)

In *Kirby*, the Court of Appeal applied the "transformative use" test in a case involving the alleged use of a celebrity's likeness in a video game. The plaintiff, Kierin Kirby, achieved fame as the lead singer of the musical group Deee-Lite which was popular in the early 1990's. Kirby alleged that video game distributor Sega violated her common law and statutory rights of publicity when it released the video game Space Channel 5 (SC5) that included as its main character a computer-generated woman named "Ulala" allegedly based on Kirby. (*Kirby, supra*, 144 Cal.App.4th at p. 51.)

SC5 is set in outer space, in the 25th century, and Ulala is a reporter who is sent to "investigate an invasion of Earth by dance-loving aliens who shoot earthlings with ray guns, causing them to dance uncontrollably." (*Kirby, supra*, 144 Cal.App.4th at p. 52.) To advance in the game, players attempt to have Ulala match the dance moves of various aliens and competitor reporters. (*Ibid.*) A Japanese choreographer and dancer created Ulala's six main dance moves. (*Id.* at p. 51.)

Kirby contended that Sega misappropriated her likeness by giving Ulala similar facial features to her own as well as by borrowing her distinctive look that combines retro and futuristic elements, including red or pink hair, platform shoes, brightly colored formfitting clothes, and short skirts. (*Kirby, supra*, 144 Cal.App.4th at pp. 51, 55–56.) In addition, Ulala's name is a phonetic variation of "ooh la la," which Kirby alleged was her "signature" lyrical expression included in three of her songs. (*Ibid.*)

The Court of Appeal concluded that there was a question of fact as to whether Sega had misappropriated Kirby's likeness in creating the character

Ulala. (*Kirby, supra*, 144 Cal.App.4th at pp. 55–56.) However, the court found that even assuming Sega used Kirby's likeness, the First Amendment provided a complete defense. "[N]otwithstanding certain similarities, Ulala is more than a mere likeness or literal depiction of Kirby," as Ulala's physique, primary hairstyle and costumes, and dance moves differed from Kirby's. (*Kirby*, at p. 59.) "Moreover, the setting for the game that features Ulala—as a space-age reporter in the 25th century—is unlike any public depiction of Kirby. . . . Taken together, these differences demonstrate Ulala is 'transformative,' and respondents added creative elements to create a new expression" such that the First Amendment barred Kirby's claim. (*Kirby*, at p. 59.) Ulala was not merely "an imitative character contrived of 'minor digital enhancements and manipulations' " (*id.* at p. 60), and unlike the use of the likenesses of The Three Stooges in *Comedy III*, any imitation of Kirby's likeness was not "the sum and substance" of Ulala's character (*Kirby*, at p. 61). Rather, like the "Autumn brothers" comic book characters in *Winter*, " 'Ulala is a "fanciful, creative character" who exists in the context of a unique and expressive video game.' " (*Kirby*, at p. 61.)

With these cases as a backdrop, we now turn to Activision's use of No Doubt's likenesses in Band Hero.

### 2. Use of No Doubt's Likenesses in Band Hero Is Not "Transformative"

Activision does not dispute that the avatars of No Doubt are computer-generated recreations of the real band members, painstakingly designed to mimic their likenesses. Indeed, as part of the licensing agreement between Activision and No Doubt, No Doubt posed for motion-capture photography to enable Activision to reproduce their likenesses, movements, and sounds with precision. Activision intentionally used these literal reproductions so that players could choose to "be" the No Doubt rock stars. The game does not permit players to alter the No Doubt avatars in any respect; they remain at all times immutable images of the real celebrity musicians, in stark contrast to the "fanciful, creative characters" in *Winter* and *Kirby*. (*Winter, supra*, 30 Cal.4th at p. 892; see *Kirby, supra*, 144 Cal.App.4th at p. 61.)

No Doubt asserts that such realistic depictions categorically disqualify their Band Hero avatars from First Amendment protection. However, as *Comedy III* held, even literal reproductions of celebrities can be "transformed" into expressive works based on the context into which the celebrity image is placed. (*Comedy III, supra*, 25 Cal.4th at p. 409 [noting, for instance, the Warhol silk screens featuring celebrity portraits, through "careful manipulation of context," convey an ironic message about the "dehumanization of celebrity" through reproductions of celebrity images]; see also *ETW*

*Corp. v. Jireh Publishing, Inc.* (6th Cir. 2003) 332 F.3d 915, 918, 936, 938 (*ETW*) [a painting featuring three literal likenesses of Tiger Woods in different poses in the foreground, with the Augusta National Clubhouse behind him and the likenesses of other famous golfing champions looking down on him, found worthy of First Amendment protection because it was a "panorama" of Woods's historic 1997 victory at the world-famous Masters Tournament and conveyed a message about the significance of Woods's achievement through images suggesting that Woods would eventually join the ranks of the world's best golfers].) Thus, when the context into which a literal celebrity depiction is placed creates " 'something new, with a further purpose or different character, altering the first [likeness] with new expression, meaning, or message,' " the depiction is protected by the First Amendment. (*Comedy III, supra,* 25 Cal.4th at p. 404; see also *id.* at p. 405, fn. 10 [work is insulated by 1st Amend. only where "added creative elements significantly transform *the celebrity depiction . . .*" (italics added)].)

Nonetheless, although context may create protected expression in the use of a celebrity's literal likeness, the context in which Activision uses the literal likenesses of No Doubt's members does not qualify the use of the likenesses for First Amendment protection. Activision contends that as in *Kirby*, where Sega used Kirby's likeness in a unique and expressive video game, Activision's use of No Doubt's likenesses in Band Hero is transformative because the video game shows the No Doubt avatars "surrounded by unique, creative elements, including in fanciful venues such as outer space . . . and performing songs that No Doubt avowedly would never perform in real life." Indeed, according to Activision, No Doubt's objection that the band can be made to perform songs it would never perform demonstrates that the use of the No Doubt avatars is transformative.

However, that the members of No Doubt object to being shown performing certain songs is irrelevant to whether that element of Band Hero combined with others transforms the literal depictions of No Doubt's members into expression that is more Activision's than pure mimicry. In that inquiry, it is the differences between *Kirby* and the instant case, not the similarities, which are determinative. In *Kirby*, the pop singer was portrayed as an entirely new character—the space-age news reporter Ulala. In Band Hero, by contrast, no matter what else occurs in the game during the depiction of the No Doubt avatars, the avatars perform rock songs, the same activity by which the band achieved and maintains its fame. Moreover, the avatars perform those songs as literal recreations of the band members. That the avatars can be manipulated to perform at fanciful venues including outer space or to sing songs the real band would object to singing, or that the avatars appear in the context of a video game that contains many other creative elements, does not transform the avatars into anything other than exact depictions of No Doubt's members doing exactly what they do as celebrities. (*Hilton v. Hallmark Cards* (9th Cir.

2010) 599 F.3d 894, 911 (*Hilton*) [Hallmark card featuring Paris Hilton's head on a cartoon waitress's body was not a "transformative use" as in *Kirby* because, despite some differences, the "basic setting" was the same as an episode of Hilton's television show in which she is depicted as "born to privilege, working as a waitress"];[6] *Keller v. Elec. Arts, Inc.* (N.D.Cal., Feb. 8, 2010, No. C 09-1967 CW) 2010 U.S.Dist. Lexis 10719, app. pending [NCAA Football video game literally depicting college football player held not "transformative" where player was represented as exactly what he was—the starting quarterback for Arizona State University—and game's setting—a football field—was "identical to where the public found [plaintiff] during his collegiate career"].)

Moreover, Activision's use of lifelike depictions of No Doubt performing songs is motivated by the commercial interest in using the band's fame to market Band Hero, because it encourages the band's sizeable fan base to purchase the game so as to perform as, or alongside, the members of No Doubt. Thus, insofar as the depiction of No Doubt is concerned, the graphics and other background content of the game are secondary, and the expressive elements of the game remain "manifestly subordinated to the overall goal of creating a conventional portrait of [No Doubt] so as to commercially exploit [its] fame." (*Comedy III, supra*, 25 Cal.4th at p. 408.) In other words, nothing in the creative elements of Band Hero elevates the depictions of No Doubt to something more than "conventional, more or less fungible, images" of its members that No Doubt should have the right to control and exploit. (*Comedy III, supra*, 25 Cal.4th at p. 405.) Thus, the trial court did not err in denying Activision's motion to strike the right of publicity claim based on Activision's assertion of a First Amendment defense.[7]

---

[6] An earlier Ninth Circuit decision, *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, arguably reached a different conclusion on facts somewhat similar to those in *Hilton*. In *Hoffman*, the court found that the First Amendment barred Dustin Hoffman's claim that Los Angeles Magazine (LAM) had violated his right of publicity when it published an article that included a photographic image of the head of Hoffman in his "Tootsie" character superimposed on the body of a cartoon male who was wearing an evening gown and high heels. (*Hoffman, supra*, 255 F.3d at p. 1183.) The court only briefly addressed the transformative use defense, finding that "[e]ven if we were to consider LAM an 'artist' and the altered 'Tootsie' photograph 'artistic expression' subject to the *Comedy III* decision, there is no question that LAM's publication of the 'Tootsie' photograph contained 'significant transformative elements' " because "Hoffman's body was eliminated and a new, differently clothed body was substituted in its place." (*Id.* at p. 1184, fn. 2.) In *Hilton*, the Ninth Circuit noted that *Hoffman* had not addressed the transformative use defense in great depth because the Supreme Court decided *Comedy III* only after oral argument in the *Hoffman* case had taken place. Thus, *Hilton* concluded that *Hoffman* was not controlling Ninth Circuit authority on the issue of the transformative use defense. (*Hilton, supra*, 599 F.3d at p. 912, fn. 15.) We similarly do not find *Hoffman*'s brief discussion or application of the transformative use defense compelling.

[7] Because we hold that Activision's use of No Doubt's likenesses is not protected by the First Amendment, we need not consider No Doubt's argument that Activision waived its First

### B. *Unfair Competition Claim*

 To state a claim for unfair competition under Business and Professions Code section 17200 (section 17200), a plaintiff must show that " 'members of the public are likely to be deceived' " by a particular business practice. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 324 [93 Cal.Rptr.3d 559, 207 P.3d 20] [California's unfair competition law protects the public from fraud, deceit and unlawful conduct].) No Doubt alleges that Activision violated section 17200 by deceiving the public into believing that No Doubt authorized the use of its name and likeness for the unlocking feature of Band Hero and that "No Doubt approves and endorses the appearance of its members individually performing songs that are wholly inappropriate and out of character for No Doubt."

Activision makes the novel argument that we should construe section 17200 to require No Doubt to prove that Activision's challenged use of No Doubt's avatars "explicitly misleads the public," i.e., that Activision *overtly represented* that No Doubt approved the unlocking feature as well as all the songs their avatars can be made to sing. Activision derives this heightened standard from federal cases construing the Lanham Act (15 U.S.C. § 1051 et seq.) in

Amendment rights by entering a licensing agreement that allegedly limits its rights to use the likenesses. The concurring opinion would affirm the trial court's judgment on the basis of the licensing agreement, interpreting it as a waiver by Activision of any First Amendment rights it may have had. The concurrence suggests that we should not reach the question of the validity of Activision's First Amendment defense because of the principle of judicial restraint that counsels against unnecessarily addressing constitutional questions. (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 17, fn. 13 [50 Cal.Rptr.3d 585, 145 P.3d 462].) This principle of constitutional adjudication is most often relied upon as the justification for refraining from deciding the constitutionality of a statute when the matter can be decided on statutory or other grounds. (E.g., *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 128–129 [105 Cal.Rptr.2d 46, 18 P.3d 1198] [where plaintiff's complaint asserted both statutory and constitutional grounds for invalidating prison regulation, court would address the statutory issue first]; *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230–231 [45 Cal.Rptr.2d 207, 902 P.2d 225] [where tax was challenged under state statute and state Constitution, it was proper to begin with statutory challenge].) Here, however, we are not being called upon to pass on the constitutionality of legislation, but rather to consider a First Amendment defense to a right of publicity claim in the context of a suit between private citizens. Moreover, while the principle of restraint in deciding constitutional issues has broader application, we are also mindful that courts must " ' " " 'closely scrutinize waivers of constitutional rights' " " and " ' " " "indulge every reasonable presumption against a waiver" ' " " ' " of First Amendment rights, which " ' " "may only be made by a 'clear and compelling' relinquishment of them." ' " (*Sanchez v. County of San Bernardino* (2009) 176 Cal.App.4th 516, 528 [98 Cal.Rptr.3d 96]; see *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1400 [88 Cal.Rptr.2d 843].) Given these circumstances, we believe the best path is to decide this case based upon what we view as a relatively straightforward application of the "transformative use" doctrine, and not on an interpretation of the licensing agreement, an issue on which we express no opinion.

the context of alleged trademark infringement by artistic works deserving of First Amendment protection. For the reasons discussed below, we hold that No Doubt is not obligated to prove that the use of its avatars in Band Hero is "explicitly misleading" in order to prevail on its section 17200 claim.

To provide context for Activision's argument, we begin with a brief discussion of how federal courts have applied the Lanham Act to artistic works alleged to infringe trademarks. The purpose of the Lanham Act, 15 United States Code section 1051 et seq., "is to 'avoid confusion in the marketplace' by allowing a trademark owner to 'prevent[] others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.' [Citation.] Trademark law aims to protect trademark owners from a false perception that they are associated with or endorse a product. [Citation.] Generally, to assess whether a defendant has infringed on a plaintiff's trademark, we apply a 'likelihood of confusion' test that asks whether use of the plaintiff's trademark by the defendant is 'likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association' of the two products. [Citation.]" (*Mattel, Inc. v. Walking Mountain Productions* (9th Cir. 2003) 353 F.3d 792, 806–807; see *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 342 [109 Cal.Rptr.3d 143].)

When the challenged use of a trademark appears in an artistic work that implicates First Amendment protections, some courts have concluded that the standard "likelihood of confusion" test under the Lanham Act is inadequate to address First Amendment concerns. The seminal case is *Rogers v. Grimaldi* (2d Cir. 1989) 875 F.2d 994 (*Rogers*), in which the Second Circuit developed an alternative to the "likelihood of confusion" test to be used for titles of artistic works that borrow names protected by trademark.

In *Rogers*, the actress Ginger Rogers sued under the Lanham Act, contending that the title of a movie, Ginger and Fred (Metro-Goldwyn-Mayer 1986), which told the story of two fictional Italian cabaret performers who imitated Rogers and Fred Astaire in their cabaret act, created the false impression that Rogers was associated with the film or that the film was about her. The trial court held that the Lanham Act did not apply to any movie title " 'within the realm of artistic expression.' " (*Rogers, supra*, 875 F.2d at p. 997.) The Second Circuit found that while the trial court's approach correctly took into account First Amendment concerns, it "unduly narrows the scope of the [Lanham] Act," because it would insulate from liability titles that were truly deceptive about their source or sponsorship. (875 F.2d at p. 997.)

The Second Circuit struck a different balance, holding that "in general the Act should be construed to apply to artistic works only where the public

interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." (*Rogers, supra,* 875 F.2d at p. 999.) Under this test, for instance, a defendant is liable under the Lanham Act if he uses a celebrity name in a book title when the name bears no relation at all to the content of the book, thereby confusing the public into thinking otherwise—a situation in which the use of the name has no artistic relevance to the work. (875 F.2d at p. 999.) And even if the celebrity name *does* bear some relevance to the content of the book (that is, has some artistic relevance to the work), the title cannot explicitly deceive the public as to its source or content, such as by claiming that it is an " 'authorized biography' " of the celebrity when it is not (an explicit misrepresentation as to the source or content). (*Ibid.*)

Applying this test in *Rogers,* the Second Circuit concluded that the Lanham Act claim failed. The title, Ginger and Fred, had genuine relevance to the film's story—the characters in the film imitated Rogers and Astaire in the characters' cabaret act. Further, nothing about the film title overtly suggested that Rogers was involved with or was the subject of the film, and the risk that some members of the public would reach either of these erroneous conclusions was outweighed by the interests in the film's artistic expression, which contrasted the "elegance and class" Rogers and Astaire embodied with the "gaudiness and banality of contemporary television." (*Rogers, supra,* 875 F.2d at p. 1001.)

In *Mattel, Inc. v. MCA Records, Inc.* (9th Cir. 2002) 296 F.3d 894 (*MCA*), the Ninth Circuit adopted the *Rogers* test and found that it barred the Barbie trademark holder's Lanham Act claim over a song entitled *Barbie Girl,* an expressive work poking fun at the values Barbie represented. (*Id.* at p. 902.) The Ninth Circuit, along with several other federal circuit courts, has since extended the *Rogers* test beyond titles of artistic works to artistic works in general. (See, e.g., *E.S.S. Entertainment 2000 v. Rock Star Videos* (9th Cir. 2008) 547 F.3d 1095, 1099 (*E.S.S.*) [finding *Rogers* test could be applied to the use of a trademark in the body of the work]; *ETW, supra,* 332 F.3d at p. 928, fn. 11 [holding the rule of *Rogers* is generally applicable to all Lanham Act cases involving artistic works where the defendant "has articulated a colorable claim" that the work is protected by the 1st Amend.]; *Cliffs Notes v. Bantam Doubleday Dell Publishing Group* (2d Cir. 1989) 886 F.2d 490, 495.)

Activision contends that we should construe section 17200 to incorporate the *Rogers* standard as an element of No Doubt's unfair competition claim, because the claim is " 'substantially congruent' " to a trademark infringement

claim under the Lanham Act, given that for both "the ' "ultimate test" ' is ' "whether the public is likely to be deceived or confused by the similarity of the marks." ' [Citations.]" (*Academy of Motion Picture Arts v. Creative House* (9th Cir. 1991) 944 F.2d 1446, 1457; see also *MCA, supra,* 296 F.3d at p. 902 [same likelihood of confusion test applies to Lanham Act claim and state law claim for unfair competition].) In other words, just as a defendant's artistic expression that infringes upon a trademark generally will be actionable under the Lanham Act only if it is "explicitly misleading," Activision contends its use of No Doubt's likenesses should not be actionable under section 17200 unless that use was "explicitly misleading."

Even if the *Rogers* "explicitly misleading" test might be applied to some section 17200 claims involving the unauthorized use of a celebrity's likeness (a conclusion we do not reach),[8] the test does not apply to No Doubt's section 17200 claim. Activision overlooks the overarching conclusion in *Rogers* that the public interest in avoiding consumer confusion must be balanced against the public interest in free expression. (*Rogers, supra,* 875 F.2d at p. 999.) The "explicitly misleading" standard comes into play only after a determination has been made that a challenged use of a trademark is worthy of heightened First Amendment protection. (*ETW, supra,* 332 F.3d at p. 926 [*Rogers* test applies to Lanham Act "false endorsement" claim only where the defendant "has articulated a colorable claim that the use of a celebrity's identity is protected by the First Amendment"]; *Facenda v. N.F.L. Films, Inc.* (3d Cir. 2008) 542 F.3d 1007, 1015 [before considering whether *Rogers* test applies,

---

[8] Although the "explicitly misleading" requirement of the *Rogers* test makes obvious sense when the title of an artistic work is at issue, and thus conventional "speech" is involved, we question whether it should apply when the actionable wrong is the misappropriation of a celebrity's likeness in a video game. In any event, no California court has interpreted section 17200 to require a showing that the defendant's actionable conduct was "explicitly misleading" when the First Amendment is implicated. In arguing that such a showing is required under California law, Activision relies solely on *E.S.S.,* in which the Ninth Circuit concluded that the First Amendment defense based on the *Rogers* test "applies equally to ESS's state law claims," which necessarily included its section 17200 claim. (*E.S.S., supra,* 547 F.3d at p. 1101.) Of course, we are not bound by the Ninth Circuit's interpretation that the *Rogers* test applies to section 17200 claims. (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 971, fn. 19 [17 Cal.Rptr.2d 242].) Moreover, *E.S.S.* contains no analysis supporting its conclusion that the *Rogers* test should apply to section 17200 claims, because the plaintiff conceded that the *Rogers* test applied, and the Ninth Circuit thus had no cause to discuss the issue. (*E.S.S., supra,* 547 F.3d at pp. 1099–1100.) Further, *E.S.S.* did not concern the literal reproduction of a celebrity's likeness, but rather alleged trademark and trade dress infringement by a virtual depiction of a strip club that shared certain characteristics with a real strip club. (*Id.* at pp. 1097–1098.)

We note that in *Kirby,* in considering a section 17200 claim based on Sega's use of Kirby's likeness, the Court of Appeal did not apply the *Rogers* test. Rather, the court used the transformative use test of *Comedy III.* The court found under that test that the First Amendment barred both the plaintiff's right of publicity claim *and* her section 17200 claim. (*Kirby, supra,* 144 Cal.App.4th at p. 61.)

court must determine whether allegedly infringing work is a work of artistic expression entitled to heightened 1st Amend. protection].)

 Here, we have already concluded that Activision's use of No Doubt's avatars is not "transformative" because the avatars are simply precise computer-generated reproductions of the band members that do not meld with the other elements of Band Hero to become, in essence, Activision's own artistic expression. In the case of such a "nontransformative" use of celebrity likenesses, "the public interest in avoiding consumer confusion outweighs the public interest in free expression" (*Rogers, supra,* 875 F.2d at p. 999), and it would make little sense to require No Doubt to make the almost impossible showing that Activision's nontransformative use of the No Doubt avatars was "explicitly misleading." Of course, to prevail on its section 17200 claim, No Doubt will still have to demonstrate that members of the public are likely to be deceived by Activision's use of the likenesses.

In sum, the trial court did not err in denying Activision's motion to strike No Doubt's section 17200 claim based on Activision's contention that its challenged use of the No Doubt avatars was not explicitly misleading.

## DISPOSITION

The judgment is affirmed. No Doubt shall recover its costs and attorneys fees on appeal.

Suzukawa, J., concurred.

**EPSTEIN, P. J.,** Concurring in part and concurring in the judgment.—The majority opinion in this case affirms the decision of the trial court, which denied Activision's special motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP (strategic lawsuit against public participation) law). I agree with that result, and concur in the judgment. In its analysis, the majority decides, first, that appellant's claims arose from First Amendment-protected activity, and hence satisfy the first prong of the test for motions under the anti-SLAPP statute. I agree with the majority's reasoning and conclusion on that issue. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

The majority then discusses the second prong of the test: whether No Doubt made a prima facie showing of probability that it would prevail on the merits of its lawsuit. It does so on a First Amendment basis, finding that the challenge to Activision Publishing, Inc.'s use of No Doubt characters and likenesses in its video game does not satisfy the "transformative use" doctrine of *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387,

391 [106 Cal.Rptr.2d 126, 21 P.3d 797] (*Comedy III*). Because of that conclusion, it does not reach No Doubt's claim that Activision had no such right in light of its contract with No Doubt. (Maj. opn., *ante*, at pp. 1035–1036, fn. 7.)

I would decide the case the other way around: I would conclude that, under the facts of this case, the contract between the parties precludes Activision's First Amendment claim, making it unnecessary to reach the "transformative use" issue. (See *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1043 [65 Cal.Rptr.3d 326] [a fundamental principle of constitutional adjudication is that court will not decide constitutional questions unless absolutely required to do so in order to dispose of matter before it], and authority cited.) That said, I do not dispute the majority's reasoning on that issue.

The majority opinion fairly and accurately sets out the factual and procedural history of the case, as well as the principal authorities for reviewing trial court decisions under the anti-SLAPP law. There is no need to reprise that discussion here.

What is central in this case (and not involved in *Comedy III* and other cases cited) is that Activision's entire right to formulate avatars taken from No Doubt performers is based on its license agreement with No Doubt. In that document (written on Activision letterhead) No Doubt licensed the use by Activision of "certain rights" as to the No Doubt name, likenesses, logos and associated trademarks, and related intellectual property (the "Licensed Property") in a Band Hero video game. No Doubt (styled "Artist" in the agreement) agreed to participate in a performance session which Activision could photograph and scan for the creation of avatars based on the No Doubt characters and performance. The agreement subordinated Activision's right to use avatars based on No Doubt "Licensed Property" upon approval by No Doubt "over the songs to be used," which approval was not to be unreasonably withheld. The "Approval Rights" section of the contract reserved to No Doubt (with exceptions not germane here) the right of prior approval of *any* use of the character likenesses (and set out a system for obtaining such approval, including a provision that a failure by No Doubt to approve or disapprove after specified notification may be deemed approval), and of "the songs to be used," which approval was not to be "unreasonably withheld."

In sum, this was a commercial agreement that granted a limited license to Activision for use of No Doubt's character likenesses in songs, all subject to No Doubt's prior approval. Activision's exploitation of the intellectual property was subject to the terms of the agreement. Having agreed to its terms, Activision cannot be heard to claim that its use of the property in ways expressly prohibited by the agreement is protected by the First Amendment.

Activision was not acting as a lampooner or commentator, nor in any context other than as a licensee of No Doubt's intellectual property. It proceeded to include in its Band Hero game No Doubt intellectual property, avatars, and sound depictions in a manner which No Doubt did not approve, had no opportunity to approve, and would not have approved. Since its rights to use this property in a video game were governed by the license agreement, Activision is precluded from relying on the "transformative use" doctrine to defend this breach of the agreement. Stated another way, the license agreement is antithetical to a First Amendment claim that Activision had a right to exploit No Doubt's intellectual property in breach of the license agreement.

I would affirm the trial court's ruling on this basis.

Appellant's petition for review by the Supreme Court was denied June 8, 2011, S191787.