Filed 2/17/15  Rhoads v. Margolis CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DELORES RHOADS et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>PETER MARGOLIS et al.,<br><br>    Defendants and Appellants.<br><br>---<br><br>DELORES RHOADS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>STEVEN ROSEN,<br><br>    Defendant and Respondent. | B249800<br><br>(Los Angeles County<br>Super. Ct. No. EC059885)<br><br>  ORDER MODIFYING OPINION<br>  AND DENYING REHEARING<br>  (CHANGE IN JUDGMENT) |

It is ordered that the opinion filed hereon on January 26, 2015 be modified as follows:

On page 22, the final sentence in the Disposition beginning "The parties are to bear . . ." is deleted; and the following language is inserted in its place:  "Margolis, Klein, Rosen and Velocity Publishing Group are to recover their costs on appeal; on remand the

trial court is to consider defendants' motions for attorney fees and determine in the first instance the appropriate award of fees, including fees incurred on appeal.

This modification constitutes a change in judgment.

The parties' petitions for rehearing are denied.

_____
　　　　　PERLUSS, P. J.　　　　　WOODS, J.　　　　　FEUER, J.[*]

_____

[*]　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DELORES RHOADS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> PETER MARGOLIS et al., <br><br> Defendants and Appellants. | B249800 <br><br> (Los Angeles County <br> Super. Ct. No. EC059885) |
| DELORES RHOADS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STEVEN ROSEN, <br><br> Defendant and Respondent. | |

APPEALS from an order of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge.  Affirmed in part and reversed in part.

Alan G. Dowling for Plaintiffs and Respondents Delores Rhoads, Kathryn Rhoads D'Argenzio and Kelle Rhoads.

Leopold, Petrich & Smith, Louis P. Petrich and Jamie Lynn Frieden, for Defendants and Appellants Peter Margolis, Andrew Klein and Velocity Publishing Group, Inc. and, for Defendant and Respondent Steven Rosen.

_____

In 2007 Delores Rhoads, Kathryn Rhoads D'Argenzio and Kelle Rhoads, the mother, sister and brother of Randy Rhoads, a well-known rock guitarist who died in a plane crash in 1982, entered into an agreement with Peter Margolis granting Margolis the right to use their personal information and memorabilia to make a documentary film about Randy.[1]  When the documentary project faltered three years later, Margolis, Andrew Klein, Steven Rosen and Velocity Publishing Group, Inc. published a book about Randy.  The family sued, alleging the book was based on materials they had provided to Margolis for the exclusive purpose of making the documentary film.  Margolis, Klein, Rosen and Velocity filed a special motion to strike the complaint pursuant to Code of Civil Procedure section 425.16 (section 425.16).  The trial court denied the motion as to all defendants other than Rosen.  We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Margolis-Rhoads Agreement*

In 1979 Randy, who was then performing with a band called Quiet Riot, was hired as lead guitarist for a new band formed by Ozzy Osbourne, who had previously been the lead vocalist for Black Sabbath.  Randy performed with Osbourne's band until 1982 when he died while on tour in a Florida plane crash at the age of 25.  He had recently been named best new guitarist by Guitar Player magazine and was recognized in 2008 as one of Rolling Stone magazine's 100 greatest guitarists.  Notwithstanding his short professional life, he has had a strong influence on other rock musicians.

---

[1]     Because several members of the families share the same last name, we refer to them by their first names for convenience and clarity.  (See *Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1191, fn. 1.)

2

The Rhoads family has kept Randy's legacy alive by giving interviews about him through the years and holding memorial gatherings on his birthday and the anniversary of his death. Many of their recorded reminiscences are available online. According to Delores, who once operated the music school where Randy learned to play electric guitar, family members have tried to accommodate the interests of Randy's fans by sharing their memories of Randy but have never tried to profit from his name. While the family knew others had written biographies or created video tributes to Randy, they had long hoped to see a documentary film depicting Randy's complete life using the family's personal memories and memorabilia.

In 2006 Margolis, a former guitar student of Randy's, approached the family about making such a documentary. Margolis was not a filmmaker but had long worked in television production. In April 2007 Margolis entered into an agreement with Delores, Kathryn and Kelle (collectively defined as "Owner") for an exclusive grant of rights "to produce a non-fiction documentary type program on the life and times of Randy Rhoads . . . ." In a paragraph entitled "Documentary Rights" the agreement provided, "In consideration of the payment to Owner of [$5,000] . . . , Owner hereby grants to Producer the right to produce, distribute and otherwise exploit one non-fiction documentary type program ('Documentary Program') in the form of a motion picture, television production or other production of approximately 43-110 minutes based on the life of Randy, and to distribute and otherwise exploit the Documentary Program, worldwide, in perpetuity in all media, now . . . or hereafter devised (the 'Documentary Rights')."

The agreement also granted Margolis an option "to acquire all 'Life Story Rights' to produce a full length motion picture, television or other production based on the Life Story Rights (which is distinguished from the Program), as a dramatic production . . . for a term which is the longer of three (3) years from the date of the completion of the Documentary Program or four (4) years from the date hereof (the 'Term')." The option was never exercised.

A paragraph entitled "Interviews" stated: "Upon Producer's request, Owner agrees, subject to her [*sic*] availability, to be interviewed by and/or consult with Producer and/or its authorized representative(s) as to the Life Story, for reasonable amounts of time, whenever reasonably required by Producer in and in connection with the Productions. In no event shall Owner knowingly give an interview for the purpose of a competing production to the Productions of Producer. Owner hereby grants to Producer the right to use any information, material, ideas, incidents, events, experiences, observations, and feelings disclosed or referred to in said interviews and/or consultations ('interview information') in and in connection with the Productions. . . ."

The term "Life Story Rights" was defined as "a grant by the Owner of all rights Owner possess[es]," including "[t]he exclusive and irrevocable right (but not the obligation) to use events from the life of Randy Rhoads (the 'Life Story') and to use Randy's name or any variant thereof and Randy's picture, photograph, portrait, or representation, or any simulation thereof, in and in connection with the Productions . . . ; [¶] [and] [t]he exclusive and irrevocable right to depict, portray, and represent Randy and Randy's life . . . in connection with the Productions . . . ." In addition, "[t]he rights granted include access to all material owned or controlled by Owner related to the Life Story, including all film, tape, records, documents, journals, Randy's personal effect[s] . . . and all other materials related thereto (the 'Materials'). Owner hereby grants to Producer the right to use and incorporate in[to] the Productions any or all of the material (subject to Producer securing all applicable clearances) but the ownership of all such materials shall remain with Owner and shall be returned to Owner in the same condition."

2. *The Documentary Production*

While negotiating the agreement with the Rhoads family, Margolis approached Dakota Entertainment North, Inc. (Dakota) to discuss financing the documentary. Dakota agreed to back the project but only if it held the rights. As drafted, the Margolis-Rhoads agreement permitted Margolis to assign his rights, "provided that no such assignments shall relieve Producer of [his] obligations hereunder unless such an assignment is to a U.S. television network or a major motion picture studio or other such similarly

4

financially capable entity which assumes Producer's obligations hereunder in writing." The day after the Margolis-Rhoads agreement was signed, Margolis assigned (by writing) all rights he received under that agreement to Dakota, which then hired Margolis to produce the documentary.[2]

Margolis began work on the documentary. He was approached by Klein, another fan of Randy's, who volunteered to work on the production. Over the next two years Margolis and Klein videotaped more than 100 interviews and obtained numerous photographs and video clips. According to the Rhoads family, Margolis did not seem to have a clear direction for the documentary; and they were displeased with the quality of the first cut. They were also surprised to learn Margolis had failed to obtain necessary releases from Osbourne to use the band's music in the documentary. Although further versions of the documentary were made under Dakota's auspices, the Rhoads family contends Margolis and Klein had already begun working on the book (a project they did not disclose to the family) and essentially abandoned the documentary. Dakota hired another person to re-edit the documentary but has never released it.

In reliance on the Margolis-Rhoads agreement, the Rhoads family contends it contributed access to Randy's musical equipment that had been in storage for 30 years; personal, private photographs of Randy and other members of the family; personal photographs and film footage of Randy obtained from Rhoads family friends and neighbors; access to Delores's home, access to Randy's automobile, costumes, jewelry and shoes; access to Delores's music school (now operated by Kelle); access to Randy's gravesite (including opening of the bars to the tomb); access to Randy's church and the "meditation garden" dedicated to his memory; original music and a music school performance; photographs of Randy's deceased body; the autopsy report and introductions to Randy's family and friends, including Osbourne, his wife Sharon and

---

[2]     The Rhoads family claims Margolis concealed from it his intention to assign the agreement to Dakota.

Alice Cooper. The Rhoads family believes the materials provided by them remain in Margolis and Klein's possession.

According to Margolis, the idea for the book was first raised in 2009 when Klein suggested Margolis ask Dakota about writing a companion book to the documentary. Dakota's president, Troy Miller, liked the idea and authorized them to pursue the book using the materials gathered by Margolis and Klein during production of the documentary. However, Miller cautioned Margolis publication of the book would require a license agreement with Dakota.[3]

When the book was finished, Miller refused to approve it until the documentary had been completed and released. Miller also claimed Dakota would own the book. After learning of Miller's demand, Klein decided to revise the book to eliminate materials as to which Dakota owned the rights. Photographs supplied by the Rhoads family were omitted, and the cover describing the book as a companion to the documentary was changed. Klein and Margolis enlisted Rosen, an accomplished journalist who had already interviewed many of the musicians depicted in the documentary, to rewrite the book. Rosen never contacted anyone from the Rhoads family.

In December 2011 Klein contacted Delores to obtain her endorsement of the book. Klein claims he offered to share the proceeds with the Rhoads family, but Delores refused. Kathryn also refused to meet with Klein and Margolis. As a result, Klein deleted portions of the book he believed contained material obtained solely from the family for the documentary.

The book was published in September 2012 by Velocity, a company formed by Klein for this purpose. According to the Rhoads family, the book contains numerous photographs taken from or of the materials they provided to Margolis. Moreover, they

---

[3] Dakota employee Anthony DiAntonio submitted a declaration in opposition to the special motion to strike confirming that Miller had initially approved the use of the Dakota materials in preparation of a book anticipated as a "companion piece to the documentary . . . ."

claim much of the text appears to contain excerpts from interview transcripts prepared for the documentary, including those of Delores, Kathryn and Kelle.

    3. *The Lawsuit*

The Rhoads family filed this lawsuit on December 6, 2012. The first amended complaint alleges causes of action against Margolis for breach of contract, against Margolis and Klein for fraud and against all defendants (Margolis, Klein, Rosen and Velocity) for invasion of privacy, violation of common law rights of publicity, misappropriation of the plaintiffs' names, voice and likenesses under Civil Code section 3344, and common law and statutory (Bus. & Prof. Code, § 17200) unfair competition.[4] The pleading demands compensatory and punitive damages, an accounting, disgorgement of profits, injunctive relief and an award of attorney fees and costs.

After answering the first amended complaint, the four defendants filed a special motion to strike pursuant to section 425.16. They supported the motion with declarations from Margolis, Klein and Rosen, as well as friends of Randy who stated their positive views of the book. The Rhoads family responded with declarations from DiAntonio, Kathryn and her husband, Kelle and Delores.

On May 30, 2013 the trial court granted the motion as to Rosen but denied it as to Margolis, Klein and Velocity. As to Rosen the court ruled the claims against him as a co-author of the book arose from protected speech activity and were without merit. As to the remaining defendants, however, the court concluded the gravamen or principal thrust of the first amended complaint, including the tort and statutory causes of action, concerned their breach of the written agreement with the Rhoads family rather than protected expression and was outside the ambit of section 425.16. As an alternative ground for its ruling denying the motion as to Margolis, Klein and Velocity, the court also ruled the Rhoads family had established a probability of prevailing on their undismissed claims.

---

[4]    The plaintiffs voluntarily dismissed a cause of action for misappropriation of Randy's name and likeness under Civil Code section 3344.1.

7

Margolis, Klein and Velocity have appealed from the order denying their section 425.16 motion. The individual members of the Rhoads family have cross-appealed from the portion of the May 30, 2013 order granting the motion as to Rosen.

## DISCUSSION

1. *Section 425.16: The Anti-SLAPP Statute*

Section 425.16, subdivision (b)(1), provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Pursuant to subdivision (e), an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

In ruling on a motion under section 425.16, the trial court engages in what is now a familiar, two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a

8

probability of prevailing on the claim.  Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67; accord, *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.)

        a. *Step one and mixed causes of action*

The moving party's burden on the threshold issue is to show "the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056; see *Scalzo v. Baker* (2010) 185 Cal.App.4th 91, 98.)  "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.  [Citation.]  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.  [Citation.]  'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e). . . .'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)  "If the defendant does not demonstrate this initial prong, the court should deny the anti-SLAPP motion and need not address the second step." (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271.)

When a special motion to strike pursuant to section 425.16 challenges a cause of action that involves both protected and nonprotected activity (sometimes referred to as a "mixed" cause of action), "if the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion." (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 414; accord, *Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 967-968; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1574.)  On the other hand, if the allegations of nonprotected conduct are collateral to the substance of the cause of action, their presence does not prevent the court from applying the statute.  As we explained in

*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308, "[A] plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action.'" (Accord, *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103.)

In applying section 425.16 to mixed causes of action, "it is the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation], and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188; see *Episcopal Church Cases* (2009) 45 Cal.4th 467, 477-478 ["This dispute [involving ownership of property] and not any protected activity, is 'the gravamen or principal thrust' of the action. [Citation.] The additional fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a property dispute into a SLAPP suit."]; see also *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 319 ["[t]he 'principal thrust or gravamen' test has been used to determine whether an action fits within the scope of the anti-SLAPP protection provided by section 425.16 when a pleading contains allegations referring to both protected and unprotected activity"].) That is, "the cause of action is vulnerable to a special motion to strike under the anti-SLAPP statute only if the protected conduct forms a substantial part of the factual basis for the claim." (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1125.)

This analysis does not require an either-or determination or mean the gravamen of a cause of action must be based only on protected activity or on nonprotected activity. Rather, the proper statement of the rule, as articulated in *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1551, footnote 7 is: "[W]here the defendant shows that the gravamen of a cause of action is based on

10

nonincidental protected activity as well as nonprotected activity, it has satisfied the first prong of the SLAPP analysis." (Accord, *Kenne v. Stennis, supra,* 230 Cal.App.4th at pp. 967-968; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra,* 172 Cal.App.4th at p. 1574.)

b. *Step two*

If the defendant establishes the statute applies, the burden shifts to the plaintiff to demonstrate a "probability" of prevailing on the claim. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.) In deciding the question of potential merit, the trial court properly considers the pleadings and evidentiary submissions of both the plaintiff and the defendant, but may not weigh the credibility or comparative strength of any competing evidence. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) The question is whether the plaintiff presented evidence in opposition to the defendant's motion that, if believed by the trier of fact, is sufficient to support a judgment in the plaintiff's favor. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.) Nonetheless, the court should grant the motion "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'" (*Taus,* at p. 714; *Wilson,* at p. 821; *Zamos,* at p. 965.)

c. *Standard of review*

The trial court's rulings on a special motion to strike are subject to our independent or de novo review. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820; accord, *Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

2. *Each of the Causes of Action Arises from Protected Expressive Activity*

That the acts of researching, writing, editing and publishing an unlicensed biography are protected activities within the meaning of section 425.16, subdivision (e), is not questioned by any of the parties.[5] The Rhoads family also does not dispute that Randy's life is a matter of public interest. The family contends, however, its claims do

---

[5]    There have been numerous biographical works written about Randy that were neither endorsed nor challenged by the Rhoads family.

not target protected conduct but rather the misuse of materials family members provided solely for the production of the documentary pursuant to the Margolis-Rhoads agreement. The licensing of this material for a specified use, the Rhoads family urges, removes its use for other purposes from the sphere of protected activity. They argue that because the gravamen of the various causes of action in the first amended complaint is the violation of the limited licensing agreement, they argue, section 425.16 does not apply.

The Rhoads family's argument—essentially adopted by the trial court—is fundamentally flawed. The claims the family asserts relating to publication of the book involve only a miniscule amount of the material gathered by Margolis and Klein. As discussed, much of the information regarding Randy was already available in the public domain; the Rhoads family had frequently and fully shared their memories of Randy prior to entering into the agreement with Margolis. Moreover, Dakota (acting principally through Margolis and Klein) interviewed dozens of people outside the Rhoads family and collected photographs and video recordings from hundreds of sources. Any rights to this additional material Dakota may have are not at issue in this litigation: The Rhoads family has not sued Dakota—the family asserts it has no quarrel with Dakota—and Dakota is not asserting claims against Margolis, Klein or Velocity either directly or by the Rhoads family as Dakota's assignee. Thus, any allegedly private Rhoads material included in the book is interwoven with, and dwarfed by, material as to which the Rhoads family has no arguable rights and the use of which was plainly protected expression. (Cf. *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures, supra,* 184 Cal.App.4th at p. 1551, fn. 7; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra,* 172 Cal.App.4th at p. 1574.)

But even if a larger amount of the book's material were at issue, or even most of it, the claim that publication of a book on the subject of a matter of public interest breaches a contract or violates common law or statutory rights unquestionably arises from protected speech activity and easily satisfies the first prong of section 425.16: The defendants' act underlying the plaintiffs' causes of action itself was "an act in furtherance of the right to petition or free speech." (*City of Cotati v. Cashman, supra,* 29 Cal.4th at

p. 78; see *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1027 (*No Doubt*).)

In *No Doubt* the members of a band entered into a contract allowing a video game producer to use images of the band in certain specified contexts. After the video game was released, the band sued alleging that the producer had used its image in contexts other than those described in the contract. The producer moved to strike the complaint under section 425.16, asserting the band's claim was predicated on a protected activity— the production of a video game. No Doubt opposed the motion, arguing that the producer had not "satisf[ied] the threshold showing under section 425.16 because a contract issue, not [the producer's] right to free speech, is at the heart of the parties' dispute." (*No Doubt, supra,* 192 Cal.App.4th at p. 1027.) Our colleagues in Division Four of this court concluded that, although the conduct at issue—production of a video game—might qualify as a breach of the parties' contract, it also involved a form of protected activity. (*Ibid.* ["'conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning'"], quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92; see *Taus v. Loftus, supra,* 40 Cal.4th at pp. 706-707 [defendants' investigation and ensuing article, based in part on allegedly fraudulently obtained interview, constituted protected activity]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164-166 [defendants' newsgathering, including surreptitiously obtained video recordings, constituted protected activity]; see also *Doe v. Gangland Productions, Inc.* (9th Cir. 2013) 730 F.3d 946, 955-956 [lawsuit alleging producer of gang documentary breached agreement to conceal gang member's identity arose from protected activity].)

The same analysis applies here. The "principal thrust" (*Martinez v. Metabolife Internat., Inc., supra,* 113 Cal.App.4th at p. 188) of every claim in the Rhoads family's first amended complaint is premised on the allegation the defendants, in researching, writing and publishing the book, used the Rhoads family's proprietary material provided solely for the purpose of the documentary. Whether or not defendants violated the terms of the Margolis-Rhoads agreement, their conduct in writing and publishing the book also

13

qualifies as a form of protected activity. (See *Doe v. Gangland Productions, Inc., supra,* 730 F.3d at p. 955 ["[b]ut for the broadcast . . . , Plaintiff would have no reason to sue Defendants"].)

   3.   *With the Exception of the Breach of Contract Cause of Action, the Rhoads Family Has Failed To Establish a Probability of Prevailing on Its Claims*

      a.   *The breach of contract cause of action*

Margolis is the only defendant named in the breach of contract cause of action. Two factual inquiries are necessary to determine his liability on that claim: 1) whether he remained bound by the agreement under the specific terms of the assignment provision, a question that turns, at least in part, on whether Dakota was a "financially capable entity" within the meaning of that provision; and 2) whether the Rhoads family can successfully establish the use of materials provided pursuant to the agreement that were otherwise unavailable to Margolis.[6] Those are inquiries for the finder of fact, and the Rhoads family has established a prima facie case that such misuse occurred.[7] (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 [to satisfy its burden under the second step of § 425.16, plaintiff must demonstrate his claims have ""'"only a minimum level of legal sufficiency and triability"'""]; accord, *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 738.)

_____

[6]      With respect to materials obtained from the Rhoads family pursuant to the Margolis-Rhoads agreement, the DiAntonio declaration identifies several "personal family photographs" provided by Kathryn, two featured quotes from an interview with Delores on June 25, 2007, photographs of the family visiting Randy's grave on July 30, 2007, and photographs resulting from access to some of Randy's equipment that may never have been publicly shown. Kathryn and Kelle assert they recognize some statements in the book as ones they made during their interviews for the documentary. The Rhoads family may not recover, however, for the use of materials gathered by Dakota in the course of preparing the documentary that did not come from Delores, Kathryn or Kelle. For instance, the rights to photographs or statements made by people who knew Randy may belong to Dakota, but those materials fall outside the scope of the Margolis-Rhoads agreement itself.

[7]      Margolis contends he acted solely as an editor on the book and thus cannot be liable for any decision as to which materials were used or how they were obtained. This distinction also requires a factual inquiry more appropriate for the finder of fact.

14

b. *The fraud cause of action*

The gist of the fraud claim is that, "in or about March and April 2007, as well as thereafter," Margolis and Klein (but not Rosen) represented orally and in writing they would use the Rhoads family material only for the production of the documentary. However, no evidence was proffered that Margolis contemplated writing a book based on the Rhoads material before he executed the agreement. (See *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30-31 ["'something more than nonperformance is required to prove the defendant's intent not to perform his promise'"].) Moreover, neither Klein (a longtime fan who only became involved in the production of the documentary well after execution of the Margolis-Rhoads agreement) nor Velocity (formed by Klein in April 2012) was involved with Margolis at the time the agreement was executed. Any subsequent representations by Klein were made pursuant to his authority from Dakota well after production of the documentary had begun. Although the Rhoads family alternatively alleges Margolis and Klein wrongfully concealed their intent to write a book, the family failed to produce any evidence that materials contained in the book were provided after 2009 when Klein first began to explore the possibility of writing one.

c. *The misappropriation causes of action*

The Rhoads family's third cause of action alleges the use of its materials invaded their individual rights of privacy, a term that can encompass any injury from public disclosure of private facts to intrusion into private places, conversations or other matters. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 24 [acknowledging four different privacy torts: "(1) intrusion into private matters; (2) public disclosure of private facts; (3) publicity placing a person in a false light; and (4) misappropriation of a person's name or likeness . . . ."]; see also *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214-282 [discussing variants of right of privacy]; *Taus v. Loftus, supra,* 40 Cal.4th at pp. 705-708 [same].) The family members characterize their invasion of privacy claim as one of misappropriation of name and likeness.

To sustain a common law cause of action for commercial misappropriation based on the right of privacy, a plaintiff must prove: "(1) the defendant's use of the plaintiff's

identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417; accord, *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679.) This cause of action is essentially identical to the fourth cause of action, which the Rhoads family has labeled violation of the common law right of publicity. The fifth cause of action alleges a violation of Civil Code section 3344, which creates a statutory remedy for commercial misappropriation and provides in part, "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising . . . without such person's prior consent . . . shall be liable for any damages sustained by the person . . . ." (Civ. Code, § 3344, subd. (a).) Under this section a plaintiff must prove not only the elements of the common law cause of action but also the knowing use by the defendant of the likeness as well as a direct connection between the alleged use and the commercial purpose. (*Stewart,* at p. 680.)

Crucially, under the common law, "no cause of action will lie for the '[p]ublication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it . . . .'" (*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793.) This First Amendment defense extends "to almost all reporting of recent events," as well as to publications about "'people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities . . . .'" (*Eastwood v. Superior Court, supra,* 149 Cal.App.3d at p. 422.) However, the defense is not absolute; a court must find "a proper accommodation between [the] competing concerns" of freedom of speech and the right of publicity. (*Ibid.*) An even broader exception applies to actions under Civil Code section 3344: "For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a)." (Civ. Code, § 3344, subd. (d).)

Thus, relatives and associates of public persons generally have no claim for invasion of their right of privacy or publicity "so long as the disclosure bears a reasonable relationship to the ties that the relative or associate had to the public person." (2 J.T. McCarthy, The Rights of Publicity and Privacy (2014 ed.) Telling the story— Liability to relatives and associates of the subject of the story, § 8:66, pp. 230-232; see *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 675 ["[n]ot only public figures, but individuals closely associated with public figures, have been precluded from maintaining actions for invasion of privacy under circumstances where there is a societal interest in disclosure"]; *Carlisle v. Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 747 [person married to celebrity when they were both teenagers had no claim for invasion of privacy after details disclosed by fan magazine].) As our colleagues in Division Two of this court have explained, "Whether appellant is considered a celebrity or not, whether he is seeking damages for injury to his feelings or for the commercial value of his name and likeness, . . . the public interest in the subject matter of the program gives rise to a constitutional protection against liability. [Citation.] [¶] Though both celebrities and non-celebrities have the right to be free from the unauthorized exploitation of their names and likenesses, every publication of someone's name or likeness does not give rise to an appropriation action. Publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it, is not ordinarily actionable. [Citations.] Public interest attaches to people who by their accomplishments or mode of living create a bona fide attention to their activities." (*Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 542.)

Here, rather than protest the attention occasioned by Randy's celebrity, Delores, Kathryn and Kelle Rhoads have long fostered the interest and access of the public to information about him and his musical talent. Other than the $5,000 paid under the Margolis-Rhoads agreement, Delores, Kathryn and Kelle disavow ever seeking compensation for their participation in interviews over the years or for disclosures in the various articles and biographies about Randy that contained photographs and information about them individually. They contend, however, they kept their most personal feelings,

17

reminiscences and property to themselves, with the intent of eventually publishing their own book. And, although they acknowledge Margolis and Klein had no obligation to seek their permission to write a book about Randy, they believe they should be compensated for the use of material licensed pursuant to the terms of the Margolis-Rhoads agreement.

This proposition, while perhaps superficially appealing, lacks merit. The subject of the book that allegedly violated the family members' rights was Randy. Most of the material shared by the Rhoads family concerned Randy and only incidentally depicted family members; as Margolis and Klein point out, photographs of Randy, his guitars or his tomb, even if never previously disclosed to the public, do not implicate the personal privacy or publicity rights of his family members. Moreover, any contention family members should be compensated for material falling within the scope of the Margolis-Rhodes agreement is properly addressed by the breach of contract cause of action; a tort cause of action does not lie unless the defendant's conduct also violates an independent duty to the plaintiff. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514-516.)

Finally, the family members admit Randy's life (and death) are matters of public interest, as are their own lives as Randy's relatives. (See *Maheu v. CBS, Inc., supra,* 201 Cal.App.3d at p. 675 ["[t]he general rule is that '"once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days"'"].) They also admit nothing in the book was objectionable or untrue. (See *Eastwood v. Superior Court, supra,* 149 Cal.App.3d at p. 426 [plaintiff failed to state cause of action under either the common law or Civ. Code, § 3344 because he failed to allege the article, which was otherwise a matter of public interest, was published with knowledge of or in reckless disregard of its falsity]; *Maheu,* at p. 677 [failure to dispute truthfulness of matters published fatal to plaintiff's cause of action when material was newsworthy].) Under these circumstances the Rhoads family has failed to establish a probability of recovery under their common law and statutory causes of action for misappropriation. (See *Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 811 ["'[i]f the

information reported has previously become part of the "public domain" or the intrusion into an individual's private life is only slight, publication will be privileged even though the social utility of the publication may be minimal'"].)

        d.  *The unfair competition cause of action*

Unfair competition under Business and Professions Code section 17200 (UCL) means "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Written in the disjunctive, section 17200 establishes "three varieties of unfair competition—acts or practices which are unlawful, unfair, or fraudulent." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163, 180 (*Cel-Tech*); accord, *Kasky v. Nike, Inc*. (2002) 27 Cal.4th 939, 949.)  The "unlawful" prong of the UCL "'borrows' violations from other laws by making them independently actionable as unfair competitive practices." (*Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1143; accord, *Kasky,* at p. 949.)

The "unfair" prong authorizes a cause of action under the UCL if the plaintiff can demonstrate the objectionable act, while not unlawful, is "unfair" within the meaning of the UCL. (*Cel-Tech, supra*, 20 Cal.4th at p. 182.)  Outside the commercial context of a plaintiff who claims to have suffered injury from a direct competitor, "a business practice is 'unfair' if (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves." (*Klein v. Chevron U.S.A., Inc*. (2012) 202 Cal.App.4th 1342, 1376;[8] compare *Cel-Tech*, at p. 187 ["[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an

---

[8]     As we explained in *Klein v. Chevron U.S.A., Inc., supra,* 202 Cal.App.4th at page 1376 and footnote 14, although there is currently a split of authority with respect to the proper definition of the term "unfair" in the context of consumer cases arising under the UCL, the Second District has consistently followed the definition enunciated by Division Eight of this court in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.

incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition"].)

Under the "fraudulent" prong, a business practice violates the UCL if it is "likely to deceive the public.  [Citations.]  It may be based on representations to the public which are untrue, and '"also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . .  A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under"' the UCL.  [Citations.]  The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer." (*McKell v. Washington Mutual, Inc*. (2006) 142 Cal.App.4th 1457, 1471; see *Paduano v. American Honda Motor Co., Inc*. (2009) 169 Cal.App.4th 1453, 1469.)  Actual deception is not necessary.  All that is required is proof that reasonable "'members of the public are likely to be deceived.'" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267.)

Despite this low threshold for proving an unlawful business practice under the UCL, the Rhoads family has not articulated an actionable manner in which the public was likely to be deceived by the book or that consumers suffered substantial injury.[9]  The family contends the book's relation to the documentary, the participation of Margolis and Klein and the book's use of a photograph of Delores constituted unfair, deceptive acts, but they have failed to produce any evidence that a reasonable consumer would have been misled by these facts, whether to believe this book, (as opposed to the other books about Randy) had been endorsed by members of the Rhoads family or in any other respect.[10]  (See *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999)

---

[9]    Because the Rhoads family's claims for misappropriation under Civil Code section 3344 and the common law fail as a matter of law, its effort to plead a UCL claim under the "unlawful" prong based on misappropriation also fails.

[10]    DiAntonio offers his opinion that many of those interviewed for the documentary did so because they believed the project had the approval of the Rhoads family, but

20

72 Cal.App.4th 861, 889 [plaintiff must provide "substantial evidentiary support that anyone was actually misled or likely to be misled"].)  The Rhoads family has failed to present an evidentiary basis for finding a reasonable probability of prevailing on the unfair competition cause of action.  Accordingly, as to this claim too, the special motion to strike should have been granted.

        e.  *Injunctive relief*

        The remaining cause of action for injunctive relief is premised on Margolis's alleged breach of the Margolis-Rhoads agreement.  Even if the Rhoads family could prove its contractual claim, however, injunctive relief would be improper.  (See Civ. Code, § 3423, subd. (e) [court may not grant injunction "[t]o prevent the breach of a contract the performance of which would not be specifically enforced"].)  Indeed, the agreement itself contains a waiver of injunctive relief:  "Subject to Producer's payment of all compensation . . . , Owner's sole and exclusive remedy for any breach, termination or cancellation by Producer hereof or any term hereof . . . shall be an action for damages and Owner irrevocably waives any right to rescission or equitable or injunctive relief."

---

provides no evidence that any of those individuals have objected to their depiction in the book.  The Rhoads family has presented no evidence the book has misled anyone, particularly within the avid, but relatively small, community of Randy's fans.  According to Klein, he has on occasion been asked whether the family has endorsed the book and has denied such endorsement.

21

## DISPOSITION

The order denying Margolis's special motion to strike is affirmed as to the contract cause of action and reversed as to all other causes of action.  The order denying the special motion to strike as to Klein and Velocity is reversed.  The order as to Rosen is affirmed.  The parties are to bear their own costs on appeal.


                                                            PERLUSS, P. J.
        We concur:


                WOODS, J.


                FEUER, J.[*]

---

[*]      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22